**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

| | | |
|---|---|---|
| NELSON IRIZARRY | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| TEXAS A&M UNIVERSITY - | § | |
| TEXARKANA, | § | |
| | § | |
| *Defendant.* | § | |

---

**PLAINTIFF'S ORIGINAL COMPLAINT**

---

NOW COMES Nelson Irizarry, Plaintiff in the above-styled and numbered cause, and files this Original Complaint against Defendant Texas A&M - Texarkana. Plaintiff would respectfully show the Court the following:

**I.  THE PARTIES**

1.1    Plaintiff Nelson Irizarry ("<u>Plaintiff</u>" or "<u>Irizarry</u>") is an individual residing in Nevada County, Arkansas.

1.2    Defendant Texas A&M - Texarkana ("<u>Defendant</u>" or "<u>TAMUT</u>") is an arm or instrumentality of the State of Texas and is a public university organized under the laws of the State of Texas. TAMUT may be served with process by serving Dr. Ross Alexander (hereafter, "<u>President Alexander</u>") in his capacity as President of TAMUT, Office of the President, 7101 University Ave. Texarkana, TX 75503.

**II.  JURISDICTION AND VENUE**

2.1    This Court has jurisdiction over this action under 28 U.S.C. § 1331 because one or more of Plaintiff's causes of action is created by federal law, specifically Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*.; the Age Discrimination in Employment Act of 1967 ("ADEA") 29 U.S.C. §§ 621 *et. seq*.; Title I and Title V of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111, *et seq*.; and Subchapters II and III of the Uniform Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C § 4311 *et seq.*

2.2     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as all or part of Plaintiff's claims accrued in Bowie County, Texas, which is within this district and division.

## III. FACTUAL BACKGROUND

### A. OVERVIEW – A DISABLED HISPANIC VETERAN AT TAMUT

3.1     Plaintiff is an Instructor of Mechanical Engineering at TAMUT. Irizarry began working for TAMUT in 2020, after a long and successful career in the Army, wherein he achieved the rank of Colonel with a specialty in Military Intelligence. Irizarry's military work took him all over the world. In particular, he spent a great deal of time in the Middle East, completing two combat tours in Iraq and eventually providing intelligence support in Saudi Arabia, Qatar, and Kuwait, as well as supporting intelligence operations from Germany for Iraq, Syria, and Afghanistan. While Irizarry earned many honors and recognitions for his service from all branches of the military and from many allied countries, his service ultimately left him 100% disabled, having suffered injuries to both shoulders, knees, an ankle, and his lower back, among other ailments.

3.2     After a 33-year career with the Army, Irizarry retired from uniformed service in October of 2019 with an Honorable Discharge. In January 2020, Irizarry obtained a part-time teaching job as an adjunct instructor at Southern Arkansas University before beginning a new full-

time career in academia at TAMUT in July of 2020. TAMUT hired him as a tenure-track Assistant Professor of Mechanical Engineering.

3.3     In addition to his status as a disabled veteran with extensive service in the Middle East, Irizarry is originally from Puerto Rico, Catholic, and Hispanic. Upon his arrival at TAMUT, Irizarry quickly became the victim of discrimination and retaliatory behavior by his colleagues and Department Chair, all of whom were practicing Muslims from countries in the Middle East. Plaintiff was deliberately kept in the dark about an application opportunity for a Program Coordinator leadership position he was qualified for and faced hostility from colleagues and supervisors when he complained about being denied those opportunities for advancement.

3.4     The university, its administration, and Irizarry's departmental colleagues created an increasingly hostile work environment for Plaintiff. Irizarry specifically spoke up against discrimination, raising concerns over TAMUT's offensive and discriminatory Hispanic Heritage Month poster which depicted a singing taco; contesting the appointment of a more junior and less-qualified faculty member as Program Coordinator without following established procedures, thereby denying Irizarry the opportunity to apply for such appointment; contesting the more favorable treatment granted to the younger and Middle Eastern new Program Coordinator, for whom a lab technician was hired; and contesting unfair allocation of university resources. He eventually filed a Title VII charge with the EEOC against TAMUT, as well as a formal grievance against the university's then-President for attempting to retroactively apply a policy change in the faculty complaint policy to his prior grievance.

3.5     Following Plaintiff's multiple complaints, and soon after he filed a Title VII charge with the EEOC, the Provost/Senior Vice President for Academic Affairs, Dr. Melinda Arnold ("Provost" or "Provost Arnold"), and the Dean of the College of Business, Engineering, and

Technology, Dr. Sushil Sharma ("Dean" or " Dean Sharma"), began a campaign of retaliation against Plaintiff, removing him from his tenure-track Assistant Professor position mid-contract and demoting him to a non-tenure-track Instructor position, while promising to keep him at the same salary. A few months later, TAMUT abruptly decreased the salary set forth in his contract. This salary decrease breached his contract, reducing his 9-month annual salary by over $20,000, and deducting $1,600 from a single month's paycheck without providing Irizarry with any procedural due process.

3.6     TAMUT's wrongful actions against Irizarry include religious and ethnic discrimination under Title VII, age discrimination under the ADEA, discrimination based on military service under the USERRA, the creation of a hostile work environment, and retaliation under Title VII.  As set forth below, TAMUT retaliated against Irizarry for filing an EEOC charge and for his previous formal and informal complaints of discrimination and other complaints; the discriminatory and hostile working conditions he endured were based on his age, Catholic religion, his Hispanic ethnicity, race and color, his Puerto Rican national origin, and his status as a 100% disabled decorated Army Veteran who had fought in the Middle East.

**B.  BACKGROUND AND EVENTS RELEVANT TO ALL CAUSES OF ACTION**

3.7     Beginning in the Fall semester of 2020, TAMUT appointed Irizarry as a tenure-track Assistant Professor of Mechanical Engineering in its College of Business, Technology, and Engineering ("CBTE"). In his appointment letter, Plaintiff was informed that his pre-tenure review would take place during the 2023-2024 academic year, and that he would be eligible to apply for tenure and promotion during the 2025-2026 academic year. Notably, his supervisors failed to inform him that he was eligible to take an extra year to apply for tenure, due to the COVID-19 pandemic.

3.8     In the months and years after his hiring in 2020, and leading up to the 2023-2024 academic year, Plaintiff was kept in the dark regarding openings for leadership advancement, for which he was qualified, and which would assist him in his eventual tenure application. For example, Irizzary learned, on or about September 11, 2022, that the Department Chair, Dr. Mohammed Morsy ("Chair Morsy"), who is from the Middle East, had silently filled the Mechanical Engineering ("MEEN") Program Coordinator position with another individual from the Middle East, Dr. Md. Nizam Uddin ("Uddin"), who was a junior faculty member without administrative experience. Uddin is in his mid-30's; Plaintiff is 58 years old. In justifying his hiring of Uddin, Chair Morsy gave credit to Uddin for accomplishments other MEEN faculty, including Plaintiff, had actually achieved. Additionally, unlike Plaintiff who had many years of experience in federal, state, and private practice, and was the only Professional Licensed Engineer in the department, Uddin had no experience in management of organizations or in public or private practice as an engineer. Plaintiff would later learn that Uddin was also given more favorable advantages, in the form of being provided extra equipment funding and lab technician support repeatedly denied to Plaintiff.

**Plaintiff contests the appointment of Uddin**

3.9     Plaintiff addressed his concerns informally the next day, on September 12, 2022, first in an email requesting to know the standards that had been used in selecting the MEEN Program Coordinator, and later that day in a meeting with Chair Morsy and Dean Divya Choudary ("Dean Choudhary"), who is from India. Plaintiff's faculty colleague, Dr. Sulaman Pashah ("Pashah"), who is originally from Pakistan, also expressed similar concerns on the same email thread and was present in that meeting.

3.10    At the September 12, 2022 meeting, Dean Choudhary defended Chair Morsy's actions in selecting the Program Coordinator, claiming the university had no formal process in place. In fact, as Plaintiff pointed out to the administrators, such a process did exist. Plaintiff also highlighted that he felt he had been denied the opportunity to apply for that leadership position, which, as he had been told by Chair Morsy during his annual evaluation, was desired for him to have prior to his upcoming pre-tenure review. The meeting concluded with Chair Morsy and Dean Choudhary attempting to "make up" for denying Plaintiff the opportunity to apply for the Program Coordinator position, including offering to have him serve as an Advisor to a student club that did not exist, and promising him the coordinator job at a future date. Plaintiff expressed that he did not wish to serve as a student club Advisor, explaining that he felt it was ethically and morally wrong to choose faculty for leadership positions outside of a fair and equitable process.

3.11    The next day, on September 13, 2022, despite Plaintiff's complaint just the day before, Chair Morsy sent out an announcement to all departmental faculty that Uddin had been selected as Program Coordinator, admitting that the established process had not been followed due to "short notice." The announcement also declared that Plaintiff would be establishing a student organization, despite Plaintiff having declined such assignment at the meeting the day before.

**Irizarry seeks to protect himself from future discriminatory treatment**

3.12    Plaintiff's frustration over being uninformed and passed over for leadership promotions continued to escalate, and he became increasingly concerned that the actions by Chair Morsy and Dean Choudhary were not only discriminatory in nature, but also that he was being set up for a future denial of tenure by preventing him from obtaining leadership positions needed for attainment of tenure. His increasing concerns of retaliation by his supervisors led Plaintiff to request to Chair Morsy, Dean Choudhary, and Provost Arnold (copied to Faculty Senate President

Corrine Hinton), in an email on October 6, 2022, that any duties he would be assigned in the future, such as membership on a committee or serving as a student club advisor, would need to be accompanied by an appointment letter or memo detailing the specific duties for that role.

3.13    Plaintiff's email provided the supervisors with his reason for requesting written details: "the suggested annual evaluation grading scale makes this type of documentation almost indispensable," and such a letter or memo would "protect [Plaintiff] against reprisals or arbitrary evaluations if the scope of duties is delivered verbally or in another ambiguous form and not recorded officially." Dean Choudhary replied that day that she wanted to set up a meeting with Plaintiff to hear his concerns, but made no statement in writing as to whether she would agree to Plaintiff's requested letter or memo of appointment.

**Plaintiff's informal grievances and informal allegations of discrimination get no response**

3.14    On or about October 10, 2022, Plaintiff elevated his complaint in a meeting with Dean Choudhary and Human Resources representative Ayala Baldwin ("Baldwin"), informing them that the meeting was part of the informal grievance process set forth in university policy "IAW UP 32.01.01.H0.01: Complaint and Appeal Procedures for Faculty Members," and that he was contemplating also filing a discrimination grievance under the university system's Civil Rights Compliance Policy.

3.15    On October 19, 2022, Plaintiff emailed HR Director Charlotte Banks ("Banks"), letting her know that the grievance process had not been followed in his complaint over the Program Coordinator situation, and that if he did not receive resolution to his informal complaint within 3 business days, he would file a formal grievance. He also informed her that "[t]here is a formal Civil Rights complaint coming for the whole aspect of Dr. Morsy's participation in arbitrary and discriminatory actions in dealing with [Plaintiff]".   After receiving no resolution to his

complaint, Plaintiff met with Provost Arnold on October 20, 2022. Although Provost Arnold met with Plaintiff, no response to Plaintiff's grievance ever came from her.

3.16    On November 9, 2022, Plaintiff emailed Provost Arnold, complaining that Uddin had been given a lab technician, while Plaintiff had always been denied a lab technician, despite his many requests since 2020. In that email, Plaintiff informed Provost Arnold that he was told by Dean Choudhary to just ask the lab technician for help, rather than the dean formally instructing the technician to help Plaintiff.

3.17    During a department meeting on November 11, 2022, Chair Morsy and Dean Choudhary, with Human Resources ("HR") Director Banks present, breached Plaintiff's right to confidentiality over his grievance by publicly discussing his complaints with the other faculty. Plaintiff spoke up at the meeting, informing the chair and dean that he had been advised by his attorney at the time to not discuss the matter publicly. Plaintiff requested the recording of the meeting, which Chair Morsy refused to give him. Plaintiff ultimately was able to obtain the requested recording from Provost Arnold, but for other requested records, was forced to file open records requests.

**Formal Complaint and Ad Hoc Committee**

3.18    Due to the lack of response by Provost Arnold over this breach of confidentiality, as well as his previous concerns, Plaintiff finally resorted to filing a formal grievance on November 30, 2022, against Chair Morsy, Dean Choudhary, and Program Coordinator Uddin. Plaintiff's grievance summarized the events that transpired leading up to that date, including being kept uninformed of the Program Coordinator position, his unequal treatment by university administrators, and the breach of confidentiality he had experienced by his chair and dean. Plaintiff also reiterated his intention to file a future grievance over the discrimination he experienced at the

hand of those administrators (discussed in more detail below). In that grievance, for resolution, Plaintiff demanded that Chair Morsy resign or be removed from his position; that Dean Choudhary be admonished; that Uddin be removed as Program Coordinator; and that a new Program Coordinator be selected, this time through an open and fair process.

3.19    The next day, on December 1, 2022, then-President Cutrer ("President Cutrer") sent a memo to Faculty Senate President Corrine Hinton, directing her to convene an *ad hoc* Faculty Complaint and Appeal Committee to hear and investigate Plaintiff's November 30, 2022, formal grievance against Chair Morsy and Dean Choudhary over the improper appointment of Program Coordinator Uddin.

**TAMUT celebrates Hispanic Heritage Month with a "karaoke-singing taco"**

3.20    Meanwhile, in late September 2022, while Irizarry's concerns over the Program Coordinator issue were working their way from informal inquiry to formal grievance, he sent an email to President Cutrer regarding Hispanic Heritage Month. Irizarry was dismayed to see a poster on campus that depicted a singing taco, advertising an event to celebrate Hispanic Heritage Month, featuring tacos and karaoke.



In his email to President Cutrer, Plaintiff wrote:

> "I always understood this month to celebrate the 'histories, cultures and contributions of American citizens whose ancestors came from Spain, Mexico, the Caribbean and Central and South America.' However, what surprised me is that our contributions appear to have been reduced to a food item from one country in particular. The perception from this graphic says it all and perpetuates a stereotype about one group in particular which is offensive in itself."; "calling eating tacos a Hispanic Heritage Month Celebration is insulting to me, my family that sacrificed so much for this nation, and all my brothers and sisters who came or are descendants of those who came from Hispanic countries. I think we can do better than this."

3.21    That same day, President Cutrer emailed Plaintiff, sharing in his concerns and thanking him for bringing the issue to her attention. She apologized for the poster and the delay in organizing Hispanic Heritage Month, empathized with Plaintiff over the storms that had recently hit Puerto Rico, and promised to include Plaintiff in planning opportunities for Hispanic Heritage Month in the future given his Puerto Rican national origin. Plaintiff replied back to President Cutrer the next day, clarifying that his point was not that Puerto Ricans were not being recognized,

but rather that the university was lumping all Hispanics into a single group in referring to them as tacos, thereby ignoring the complexity of the different heritages of Hispanics in America.

**Plaintiff files a charge of discrimination with the EEOC under Title VII; two days later the Faculty Senate finds against Plaintiff's prior grievance.**

3.22    On January 17, 2023, Plaintiff carried out his promise to TAMUT to file a formal charge (# 450-2023-01617) of discrimination against the university. He did so directly to the EEOC, wherein he asserted that TAMUT had violated Title VII and the ADEA in discriminating against him on the bases of national origin and age.

3.23    Just one day after Plaintiff filed his charge with the EEOC, President Cutrer revised the faculty complaint procedure, UP 32.01.01.H0.01, giving the President more time to provide a response to faculty grievances. Plaintiff filed a formal complaint to the university system Compliance Investigator over the revisions to the operating procedure, but his grievance was denied (as discussed more fully below). Two days after President Cutrer changed the university's grievance policy (three days after Plaintiff filed his EEOC charge), the Faculty Senate President issued the *ad hoc* committee's investigative report to the President, failing to support Plaintiff's November 30, 2022, grievance.

**Retaliation: TAMUT demotes Irizarry, taking him off the tenure track, and unilaterally decreasing his pay mid-contract**

3.24    As set forth in his original appointment letter of April 22, 2020, Plaintiff was to have his Pre-Tenure review during the 2023-2024 academic year, in anticipation of his application for tenure and promotion during academic year 2025-2026. Unfortunately for Plaintiff, the timing of the review coincided with his multiple complaints to administrators over discrimination and working conditions.

3.25    Initially, Plaintiff was contacted by Provost Arnold in April of 2023, instructing him to have a meeting with Dean Choudhary for his Pre-Tenure review. A meeting was scheduled between Plaintiff and Chair Morsy for Plaintiff's annual performance evaluation and his Pre-Tenure review—which was scheduled to happen simultaneously. However, at that meeting, Dean Choudhary attended unannounced. Notably, while Plaintiff still had an on-going grievance against Dean Choudhary. After the May 1, 2023 evaluation and Pre-Tenure review meeting, Dean Choudhary put negative comments in Plaintiff's evaluations. On May 25, 2023, Plaintiff emailed Dean Sharma to complain about the negative comments Dean Choudhary had put into his evaluation, and that Plaintiff would therefore not be signing the evaluation, explaining that he felt he was "convinced that [he is] a victim of retribution." By the end of that semester, Dean Choudhary resigned.

3.26    Although Plaintiff was told by a faculty colleague that he would need to submit a portfolio by September of 2023 for his Pre-Tenure review, Plaintiff, thinking that his Pre-Tenure review would be part of his annual evaluation set to take place in April or May of 2024, did not submit the portfolio. At the time, TAMUT was notorious for revising its practices regarding dates for annual review, but never put those revisions into policy. Soon after, Provost Arnold presented Plaintiff a declaration that he did not meet the requirements to move forward on the tenure-track because he did not submit his portfolio.

3.27    Plaintiff was called into a meeting on or about October 9, 2023 with Provost Arnold and the new Dean of the College of Business, Engineering, and Technology, Dr. Sushil Sharma ("Dean Sharma"). At that meeting, Plaintiff was told that he had not submitted his portfolio for his Pre-Tenure review, and therefore was not going to be permitted to continue on a tenure-track career path. They also informed him he was being stripped of his title of Assistant Professor. Provost

Arnold instead offered that Plaintiff could continue as either a full-time, non-tenure track Instructor, or as an adjunct instructor (non-tenure track, part-time). No procedural due process ever took place prior to removing Plaintiff from his tenure-track position and demoting his title.

3.28    During that meeting, Plaintiff informed Provost Arnold and Dean Sharma that although he had missed the deadline to submit his Pre-Tenure review portfolio, he was already owed an additional year to apply because of a one-year extension given to all faculty due to COVID-19. When he brought this fact up to the Provost and Dean, Plaintiff was told that the opportunity for the one-year extension had passed—although no date of expiration had ever been presented. Plaintiff made it clear during the meeting that he wished to remain tenure-track in pursuit of attaining tenure in the future. At the conclusion of the meeting, Provost Arnold turned to Plaintiff and said "I could have changed your salary, but I am not going to."

3.29    On November 17, 2023, Plaintiff received a letter of appointment, signed by Provost Arnold, declaring he was being appointed as a non-tenure-track Instructor for the upcoming Spring, 2024 semester. As promised by Provost Arnold in the October 9, 2023, meeting, Plaintiff's 9-month salary remained at $95,172 (prorated). However, in March of 2024, Plaintiff received an email from Dean Sharma stating that while Provost Arnold had kept his salary at $95,000, it would be reduced to $70,000 for the 2024-2025 academic year. Plaintiff did not respond to that email.

3.30    On February 1, 2024, Plaintiff discovered, after the "winner" was announced, that he had not been afforded an opportunity to vote in an election for which he was running for Senator-at-Large to represent his department in the Faculty Senate. Plaintiff complained to Dean Sharma that he felt being left out of the voting was intentional. Dean Sharma blamed a Qualtrics software glitch for the error, stating that the software email to Plaintiff had bounced back. Dean

Sharma indicated that Institutional Effectiveness Officer Jennifer Willis, who was close with the Provost, was the one who had sent out the Qualtrics vote, and offered for Plaintiff to still vote, despite the winner having already been announced. Plaintiff made it clear to Dean Sharma that it could not have been a software error, as the software does not generate email addresses. Rather, it was human error –as someone from the university had originally entered the wrong email address.

3.31    On or about May 16, 2024, Plaintiff received a new 9-month contract for the 2024-2025 academic year. The contract, dated May 13, 2024, was already signed by Provost Arnold. Later that day, Plaintiff received a letter of appointment from Provost Arnold indicating that his new contract had been recommended by Dean Sharma. Despite Dean Sharma's previous March 2024 email indicating otherwise, Plaintiff's contract indicated his 9-month salary for the 2024-2025 academic year would be $95,172, in accordance with the Provost's comments in December. Plaintiff signed the contract and submitted it the same day, promptly receiving a receipt from the university verifying submission of the signed contract.

3.32    On or about August 14, 2024, all faculty at TAMUT received notice from Provost Arnold that the contract start date indicated in the May 2024 signed contracts was in error, and that some of the faculty would be receiving new contracts with a start date of August 16, 2024. Plaintiff received no new contract prior to the start of the Fall 2024 semester, and TAMUT paid him at the end of August in accordance with the $95,172 salary set forth in his May 2024 contract.

3.33    Plaintiff had already been teaching for multiple weeks during the Fall 2024 term and had been paid pursuant to the contract he and the Provost signed in May of 2024, when he received a "new contract" on September 16, 2024. In the new contract, it indicated that Plaintiff's salary for the 2024-2025 academic year would be $70,000, instead of the $95,172 he had agreed to when he signed the contract that the Provost sent him in May. On September 19, 2024, the

university processed the reduction in salary. TAMUT posted a "Compensation Change" transaction document, which was later removed from its Workday software platform, showing the reduction in Plaintiff's salary was put in place and endorsed by multiple levels in the chain of command, up through Provost Arnold. Plaintiff received a DocuSign request to sign his contract on September 23, 2024. Plaintiff did not sign the new $70,000 contract.

3.34    Because Plaintiff had already been paid for the month of August 2024 based on his original May 2024 signed contract, the university deducted an extra $1,600 from his already-reduced October 2024 paycheck, as reimbursement to itself for the "extra" pay Plaintiff received when he was paid in August 2024 based on his original May 2024 contract.

3.35    TAMUT's creation of a discriminatory, retaliatory, and hostile work environment against Plaintiff remains on-going at the time of the filing of this lawsuit. Most recently, on November 4, 2024, Plaintiff participated in a meeting with Provost Arnold and engineering faculty in which the creation of a search committee for a new Civil Engineering faculty member was discussed. During the meeting, the Provost mockingly looked straight at Plaintiff, declaring to those present "[it] will be great once we have a Civil Engineering faculty member!," despite Provost Arnold having full knowledge that Plaintiff, whom Provost Arnold removed from the tenure-track faculty and demoted to the position of non-tenure-track "Instructor," is a licensed Civil Engineer, the only one in the department. Plaintiff also learned in that meeting that despite being the only Civil Engineer in the department, he was not being included on the search committee.

3.36    No procedural due process of any kind, or appeal process was afforded to Plaintiff for the university's removal of Plaintiff from his tenure track, for his premature denial of tenure, for his demotion, and for his diminution in salary. Defendant removed Plaintiff from his tenure-

track status so that he could never earn tenure, deprived him of his title of Assistant Professor, demoted him to teaching as a non-tenure-track Instructor, breached his contract, reduced his 9-month salary by over $20,000 per year, and removed an extra $1,600 from one of his paychecks to reimburse itself for having paid Plaintiff based on his signed May 2024 contract. That is, even if TAMUT were entitled to put Plaintiff on a $70,000 contract, which Plaintiff denies, he never even received such a contract until mid-September, two weeks after he had been paid in accordance with the May 2024 contract.

3.37    Accordingly, as listed below:

a.    Defendant took such actions in retaliation for Plaintiff's well-founded allegations of discrimination based on his age and national origin, in violation of Title VII.

b.    Additionally, and/or in the alternative, these actions were discriminatory, and were taken based on his age, in violation of the ADEA.

c.    Additionally, and/or in the alternative, these actions were discriminatory and based on his religion, national origin, ethnicity, and/or race, in violation of Title VII.

d.    Additionally, and/or in the alternative, these actions were discriminatory and based on his disabilities, in violation of the ADA.

e.    Additionally, and/or in the alternative, these actions were discriminatory and based on his former service in the Army, in violation of the USERRA.

## IV.  CAUSES OF ACTION

4.1    *Alternative Pleadings*.  To the extent necessary, each of the claims set forth below is pleaded in the alternative. Further, to the extent necessary, all allegations set forth above in the Factual Background section of this Complaint are hereby referenced and fully incorporated in each of the claims below by this specific reference, as though set forth in full.

**Count 1: Discrimination on the bases of age, disability, religion, national origin, race, color, and ethnicity**

*Violation of Title VII, the ADA, and the ADEA*

4.2    Title VII prohibits discrimination based on race, color, sex, religion, disability, ethnicity, and national origin. *See* 42 U.S.C. §2000e-2(a)(1). Specifically, Title VII prohibits discrimination based on those characteristics "with respect to [an employee's] compensation, terms, conditions, or privileges of employment." Title I of the ADA prohibits discrimination based on disability. The ADEA prohibits discrimination based on age.

4.3    On or about October 9, 2024, Plaintiff signed and submitted an EEOC charge against Defendant for (1) discrimination on the bases of disability, religion, race, color, ethnicity, and national origin, and for (2) retaliation. His charge was assigned EEOC Number 450-2025-00303. He previously filed a charge with the EEOC alleging age discrimination.

4.4    On October 15, 2024, Plaintiff received a letter from the EEOC notifying him of his right to sue within ninety days on his claims under Title VII and under the ADA. Irizarry has timely brought this lawsuit within ninety days of his receipt of the right to sue letter.

4.5    As set forth above, Defendant TAMUT, through the Provost, Dean, Department Chair, and departmental faculty, has discriminated against Plaintiff based on his national origin (an American citizen from Puerto Rico), his Hispanic ethnicity and race, his color (brown), his Catholic religion, and his status as a 100% disabled Veteran.

4.6    Incorporating all allegations set forth in Section III of this Complaint, Defendant has, through its employees, discriminated against Plaintiff in his compensation, in the terms, conditions, and privileges of his employment, by creating a hostile work environment that exacerbated his existing disabilities and caused new life-threatening cardiovascular problems and mental anguish, and by breaching his contract and reducing his 9-month salary by over $20,000,

mid-contract, without any procedural due process. This has caused damage to Plaintiff for which, having exhausted his administrative remedies, now sues.

**Count 2: Employer Discrimination on the basis of prior military service**

***Violation of the Uniformed Services Employment and Reemployment Act of 1994 (USERRA)***

4.7    The Uniformed Services Employment and Reemployment Act of 1994 ("USERRA") prohibits employer discrimination against employees who have served in the military. *See* 38 U.S.C. § 4311a-c. USERRA specifically prohibits an employer from denying promotion and benefits to an employee on the basis of that employee's prior or current uniformed service. In cases of denial of promotion or benefits to an employee, under USERRA, the employee's prior service in the military is a motivating factor in the employer's actions against the employee unless the employer can prove that the action would have been taken anyway in the absence of the employee's uniformed service.

4.8    Plaintiff served for 33 years in the United States Army, earning the rank of Colonel, and becoming a 100% disabled Veteran on account of his uniformed service. He completed two tours in Iraq, engaged in combat, and specialized in military intelligence operations in multiple countries in the Middle East, as well as in Germany.

4.9    Plaintiff began his academic career with Defendant within a year after he retired from the Army. In his department of Mechanical Engineering, all full-time faculty colleagues in that department, including Chair Morsy, were from the Middle East, were not citizens of the United States, and were practicing Muslims. Defendant's actions against Plaintiff included denying him an application opportunity for promotion; causing him to be unable to vote in a Faculty Senate election, in which he was a candidate for office; removing him from being a tenure-track Assistant Professor, mid-contract, without any procedural due process despite still having a year left before

applying for tenure; demoting him to the position of non-tenure-track Instructor; and ultimately, breaching his contract and reducing his salary by over $20,000 (including automatically deducting $1,600 from his October 2024 paycheck).

4.10    The actions by Defendant, as delineated in Section III of this complaint, constituted denial of promotion and benefits to Plaintiff and were motivated by the fact that he had served in the uniformed services, largely in the Middle East, and fought against Muslims (thereby motivating reprisal by his departmental colleagues and Chair, who were all non-citizens from the Middle East and were all Muslim). In denying Plaintiff opportunities for promotion, stripping him of his tenure-track status, demoting him of his title from Assistant Professor to Instructor, breaching his contract, and ultimately robbing him of over $20,000 in his salary mid-contract without any procedural due process, Defendant has violated USERRA resulting in damage to Plaintiff, for which he now sues.

**Count 3: Employer Retaliation for Protected Conduct**

*Violation of Title VII*

4.11    Title VII prohibits retaliation by an employer against an employee who opposes an employment practice that violates Title VII. *See* 42 U.S.C. § 2000e3(a). As set forth above, the actions of Defendant were taken in retaliation for Plaintiff's internal complaints, and complaint to the EEOC, regarding discrimination by TAMUT administrators against him. This retaliation has, as set forth above, resulted in damage to Plaintiff, for which he here sues.

## V.  <u>REQUESTED RELIEF</u>

5.1    As the direct and/or proximate result of TAMUT's actions complained of herein, Plaintiff has been damaged and seeks recovery of the full measure of relief and damages against TAMUT to which he is entitled, including but not limited to actual and/or economic damages, back pay, front pay, damages for mental anguish and emotional distress, nominal damages, if

applicable, equitable relief reinstating him as a tenure-track professor and restoring his salary, and compensatory damages.

## VI.  FEES, COSTS, AND INTEREST

6.1    Plaintiff has retained the law firm of Hill Gilstrap, P.C. to represent him in connection with this matter, and has agreed to pay the law firm its reasonable and necessary attorneys' fees and costs in connection with such representation. Without waiving and/or limiting any other relief requested, Plaintiff seeks to recover his reasonable and necessary attorneys' fees and costs incurred and to be incurred in bringing this suit and in all appeals of this suit, as permitted by law or in equity, specifically including 42 U.S.C. § 2000e-5(k) and 38 U.S.C § 4323(h)(2).

6.2    Plaintiff is also entitled to and seeks to recover costs of court, expert witness fees, along with pre-judgment and post-judgment interest at the maximum rate permitted by law.

## VII.  CONDITIONS PRECEDENT

7.1    All conditions precedent to the Plaintiff's recovery on the claims alleged herein have been performed or have occurred.

## VIII.  DEMAND FOR JURY TRIAL

8.1    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests a jury trial and has tendered, or will tender, the requisite fee.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that upon final hearing, Plaintiff recovers judgment against Defendant and be awarded:

(a)    any and all amounts recoverable and/or recognizable as damages under law and/or in equity, resulting and/or occasioned by the wrongful acts and/or conduct of Defendant (as set forth above more specifically), including both actual and nominal damages;

(b)    his litigation expenses and costs, including but not limited to attorneys' fees and costs and any applicable expert fees;

(c)    costs of court, pre-judgment and post-judgment interest, at the maximum rate as allowed by law; and

(d)    such other and further relief, both general and special, at law or in equity, to which he may be justly entitled.

Respectfully submitted,

*/s/ Frank Hill*
Frank Hill – SBN 09632000
fhill@hillgilstrap.com
Stefanie Klein – SBN 11565650
sklein@hillgilstrap.com
HILL GILSTRAP, P.C.
1400 W. Abram St.
Arlington, Texas 76013
(817) 261-2222
(817) 861-4685 FAX

**ATTORNEYS FOR PLAINTIFF
NELSON IRIZARRY**