IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TEXARKANA DIVISION

NELSON IRIZARRY,                    )(
      PLAINTIFF,                    )(    CIVIL ACTION NO.
                                    )(    5:24-CV-160-RWS
VS.                                 )(    TEXARKANA, TEXAS
                                    )(
TEXAS A&M UNIVERSITY                )(
TEXARKANA,                          )(    MARCH 5, 2026
      DEFENDANT.                    )(    2:03 P.M.


MOTION HEARING

BEFORE THE HONORABLE ROBERT W. SCHROEDER III

UNITED STATES DISTRICT JUDGE


FOR THE PLAINTIFF:        Ms. Stefanie M. Klein
                          Hill Gilstrap, PC
                          1400 West Abram Street
                          Arlington, TX 76013

FOR THE DEFENDANT:        Mr. John T. Ramsey
                          Office of the Attorney General
                          P.O. Box 12548
                          Austin, TX 78711

COURT REPORTER:           Ms. Shelly Holmes, CSR, TCRR
                          Official Court Reporter
                          Honorable Robert W. Schroeder III
                          United States District Judge
                          Eastern District of Texas
                          Texarkana Division
                          500 North State Line Avenue
                          Texarkana, TX 75501
                          shelly_holmes@txed.uscourts.gov

(Proceedings recorded by mechanical stenography, transcript produced on a CAT system.)

COURT SECURITY OFFICER: All rise.

THE COURT: Please be seated.

Ms. Combs, if you would, call the case for us.

COURTROOM DEPUTY: Cause No. 5:24-CV-160, Nelson Irizarry versus Texas A&M University Texarkana.

THE COURT: Announcements for the record?

MS. KLEIN: For the Plaintiff, Dr. Nelson Irizarry, my name is Stefanie Klein.

THE COURT: Good afternoon, Ms. Klein.

MR. RAMSEY: Good afternoon, Your Honor. John Ramsey on behalf of Texas A&M University of Texarkana.

THE COURT: Hello, Mr. Ramsey.

Mr. Irizarry, you're a party to this matter. You can come forward and sit with your counsel, if you wish to do so.

Okay. We are here on the Defendant's motion to dismiss, Docket No. 38. A response was filed to that, Docket No. 39. And the Defendant replied, and that may be found at Docket No. 40.

Of course, I'm familiar with the issues in this case. We've been here on motions with respect to the first -- the first complaint and then I think the first amended complaint. So I look forward to the parties' presentation this afternoon.

Mr. Ramsey, whenever you're ready to go forward,

you may do so.

MR. RAMSEY:  Thank you, Your Honor.

I'd like to start actually with what is at least on its face maybe the slimmest part of our briefing, which is the issue of exhaustion.  And I would like to talk a little bit about what was parties have argued with regard to exhaustion, and I'd like to kind of back that out and talk about why parties should exhaust, the effect of that exhaustion, and how it affects the lawsuit.

So I think I can do my best to objectively state the parties' positions here.  The Defendant has said that this new fact regarding Professor Ren's salary transforms this case into a disparate pay claim, which is fundamentally different than what was put forth in the EEOC charge.

In response --

THE COURT:  Before you get very far, has there been a new EEOC charge?

MR. RAMSEY:  No, Your Honor.

THE COURT:  Okay.

MR. RAMSEY:  In response, Irizarry says, well, look, hey, we said we were discriminated against, and we said that TAMUT lowered our salary.  What more do you want?

So with that as background, I want to talk about this tension regarding how much specificity is enough

specificity, and there's -- there is a tension in the sense that the EEOC charge should put the Defendant on notice on what the Plaintiff is claiming.

At the same time, the Plaintiff doesn't have to get it exactly right. And so the way the courts have worked through this tension is to say, okay, it doesn't have to be exactly right, but it should be -- the claim in the EEOC should be either clear or discoverable through the investigation of the EEOC. In other words, you don't have to say everything that was wrong, but it should be so -- it should be related enough to the charge that throughout the investigation, the university is on notice.

So the reason that's important here is because in this instance, Irizarry filed an EEOC charge and then immediately asked for a right-to-sue letter, which completely foreclosed the possibility of an EEOC investigation.

So what is the purpose of an EEOC investigation? I mean, one thing is to not inundate the Court with lawsuits that could be better resolved through an administrative process.

The other is to allow the Defendant to understand the problems and try to correct them, or to respond to the problems or make sure that all the parties are aware of all the issues here.

And so the reason that matters is because in this case, we have this allegation that Professor Ren made $90,000, and there was no mechanism by which TAMUT could clear the record, could inform Dr. Irizarry that that is not true.

Now, obviously, our motion to dismiss is limited to the facts as alleged, but when this Court is analyzing whether or not exhaustion really matters, it is important to note that Professor Ren, at the times relevant to this lawsuit, made $72,000 a year, not the $90,000 as alleged. In other words, Dr. Irizarry made 70,000, and Professor Ren made 72,000. And then in 2024/'25, she made 75,000.

Again, that is outside the record, and I trust obviously that this Court -- if this was a jury, I wouldn't even be mentioning that. So I trust that this Court will put that aside when looking at the motion to dismiss. I mention it because it is really crucial to understanding the importance of exhaustion and what it means when a Plaintiff says I'm filing my EEOC charge, immediately issue me a right-to-sue letter, and then moves forward with a lawsuit.

I'll make one more comment on that before I move on, which is that this is -- you know, we have several lawsuits right now from the law offices of Hill Gilstrap, and this is what is occurring. They're filing an EEOC

charge, they're asking for a right to sue the same day, same week, and then filing suit, and there is no process. There is no actual exhaustion. So the purposes of exhaustion are completely cut off.

And so that's obviously, you know -- I start there because I do think that's important to note as we talk about the motion to dismiss, because what this has come down to now through three iterations of the complaint is Dr. Irizarry alleges that he makes less than Professor Ren.

Setting aside everything I just said and assuming that's true, it is not sufficient -- it is -- based on this Court's prior ruling. For instance, this Court has already determined that him being removed from the tenure track was not discriminatory. It was the effect of him not applying for tenure.

So we are down to whether or not his reduction in salary is discriminatory, and his sole evidence that it's discriminatory is that Professor Ren, a lecturer in a different department who teaches a different subject matter, makes more than him.

At this point, I am pretty much going straight into the briefing. I mean, I'm happy to continue, but I also want to make sure that I'm focusing on what the Court would like me to focus on.

THE COURT: You are. And I certainly can read the

brief myself. I have read the brief myself, but -- so, you know -- but feel free to make whatever argument you wish to make. You don't need to, you know -- just sort of rotely go through your briefing. If you'll summarize it however you wish to do so, that will be good.

MR. RAMSEY: Sure. So I want to talk about this idea of where this Court at the motion to dismiss stage should draw the line on a similarly situated employee or someone in nearly identical circumstances.

The first question is whether this Court needs to look at that at all. Does Irizarry need to plead that? I think the answer, based on this Court's prior ruling, is yes, especially when that is the evidence of pay disparity and discrimination.

So I think another important point to note here is it's not as if Texas A&M University of Texarkana is the one that's brought up Professor Ren. It is Irizarry who says, I know this was discriminatory because look at Professor Ren's salary. So he has pleaded that. We're not saying that's not detailed enough. We're saying that when you look at the facts as pleaded, it is not sufficient to show at the motion to dismiss stage that discrimination has occurred because case law, some of it at the motion to dismiss stage, some at the motion for summary judgment stage, has made it clear that within the university

context, a department is the proper analysis for a comparator.

And as we point out in our briefing, Irizarry seems to intuit that. In his complaints -- even in his response to the motion to dismiss, he constantly focuses on the department phase -- the department stratum of the university.

So in summarizing our position on the disparate pay claim, Irizarry has put forth Professor Ren. There is no support in case law to suggest that a professor from a different department who teaches a different course and a different subject matter is a proper comparator when looking at pay disparity. And for the same --

THE COURT: But so -- I guess the question is why would it not be, though? I mean, because you look in all kinds of other fields. You know, you look at similar positions doing the same or similar kind of work, same or similar kinds of responsibilities and duties and, you know, workload. So why -- what is unique about the university setting that would suggest something like that wouldn't be the law?

MR. RAMSEY: Sure. I think, you know, the -- the clearest example would be, you know, for instance, someone who is -- no offense to anthropologists, but an anthropology professor compared to a professor of

obstetrics. And there's this clear dynamic there where outside the university context, a doctor can make a lot more money than can an anthropologist. So that's just one kind of example where we can see that the difference in earning income outside of the university setting might be a reason for that.

The other is, you know, you can understand that there is a difference in the amount of research that someone has to do or the kind of courses someone has to take, the amount of grading someone might have to do. There's all kinds of distinctions that, to be clear, I'm not even the one making. The courts have made that distinction time and time again, including in the Fifth Circuit coming out of the Eastern District of Louisiana, the Raj case that's cited in both briefings, Raj versus LSU in which a science professor said he was making less than other science professors. And that was not good enough at the motion to dismiss stage.

And then, finally, I would point this Court to Irizarry's own pleadings. Not only does he make the department distinction, there are times where he makes a distinction between mechanical engineers and civil engineers, saying that he should have been given an opportunity because he's a civil engineer, and it went to a mechanical engineer.

So I think there's lots of reasons both in the record and without to make that distinction, and that's why the courts have repeatedly made it.

THE COURT: That's fair enough. I appreciate that context. Thank you.

MR. RAMSEY: So with regard to his disparate treatment claim, it's all the same, if that is what we're looking at. I think this is a disparate pay claim at this point. He is saying I'm getting paid differently than someone outside my --

THE COURT: Was that part of the EEOC charge?

MR. RAMSEY: Excuse me?

THE COURT: Was that part of the EEOC charge was a disparate -- disparity in pay alleged as part of the complaint to the EEOC?

MR. RAMSEY: No, Your Honor. And I just -- I want to be completely objective here. We certainly say it wasn't, and I believe -- and obviously, Ms. Klein can speak for herself, but I believe their position is that it wasn't technically part of the charge, but it was close enough. We mentioned that he was paid less.

What he does not mention in the charge, though, is I was paid less than someone similarly situated outside of my protected classes, which does bring me to the point of protected classes.

They mention that Professor Ren is from China. That is all that's mentioned as far as what this Court can know for certain or have to assume for certain regarding this stage of the pleadings.

But I want to go to the disparate treatment claim, assuming that that is how this is going to be couched from Irizarry's standpoint.

In a disparate treatment claim, Irizarry would need to put forth that he received treatment different from someone outside of his protected classes in nearly identical circumstances. So as I've mentioned, different department, different expertise, different courses, et cetera.

But also, Professor Ren was never on the tenure track and removed from the tenure track after failing to apply. This means that they are not being -- they're not in the exact same circumstances. We put it in terms of -- well, the courts often put that in terms of exact same conduct or misconduct.

As we mentioned in the briefing, we're not alleging that Dr. Irizarry, through his failure to apply for tenure, engaged in misconduct. What we are alleging is that he was allotted a tenure-track professorship that he then did not properly pursue such that he had to be removed from that position, and that is notably different than

someone who comes in as an instructor, maintains their employment as an instructor, and moves forward.

THE COURT: Tell me how it's different.

MR. RAMSEY: Again, in the university context, that is a -- well, I think -- backing up, I think all parties agree it is better to be a tenure-track professor than not. Certainly Irizarry's claim is premised on the idea that it's better to be a tenure-tracked professor than not.

So as far as that takes up there are only so many tenure-tracked professorships that each department is to get allotted, Irizarry took one of those spots, and then failed to take advantage of it, failed to fulfill the promises of that position, and so Texas A&M Texarkana had to put someone else in that position theoretically. It's now a -- now, there is a position that is for a tenure-track position that has to be filled at that level of salary, and now Irizarry can no longer fill that, and he has to go to an instructor position. So it is a demotion, and it requires transition on the university's part.

THE COURT: Does the fact that the faculty is comparatively small mean that the number of comparators is necessarily limited? Does the law -- I'm not familiar enough with the law to know. Does the law make any sort of a distinction between the size of a particular university

or organization and whether there are, you know, an unlimited number of comparators, and the Plaintiff has just failed to do a good job of identifying one or where there are just very few comparators with which you could compare a Plaintiff?

MR. RAMSEY: Well, I want to answer your question head-on first and say I don't know.

THE COURT: Okay.

MR. RAMSEY: I don't know that there's a case law that says if there are only, you know -- I suppose there's a certain level that I'm -- you know, a threshold where even the EEOC and all this -- you know, Title VII even applies to you.

THE COURT: Well, that's 15, I think.

MR. RAMSEY: Yeah, so that's as low as 15. So there's some threshold there.

But beyond that, I'm not aware of a situation where there's only two people in a position, and so there -- there is not a proper comparator.

So short answer is I don't know, Your Honor. The longer answer is I would push back against the idea that we have a small pool here. You know, there is -- I don't know the exact number, although there is an exhibit that puts forth how many professors there are in the engineering department and then how many professors there are in, you

know, the CBET.

But all that to say it is Plaintiff's burden at this point to identify a comparator. Beyond that, he has identified a comparator. And I want to be clear about why he has done that, and that's because there is no other evidence -- let me put it this way, there is clear evidence from his own complaint that his change in salary was a result of his demotion after his failure to properly apply for tenure.

So it is -- the reason Professor Ren comes into the picture is because he says, hey, look, there's this other person that has a different salary than me, and that's evidence of discrimination. TAMUT is simply saying, no, that's not evidence of discrimination because that's a completely different position in a different department.

I think I'm being clear, but I want -- in other words, TAMUT is not the one that says you -- from the very beginning, you have to name a comparator. It is just that that is the -- not that I wouldn't make that argument, but in this situation, it is just that Irizarry has said, oh, look, look, look, look at this person making more money than me. That's evidence of discrimination. And we're saying not under case law it's not.

THE COURT: Fair enough.

MR. RAMSEY: Unless the Court has any more

questions for me, I'll sit down for a little bit.

THE COURT: Let's see, I don't think I have any more questions for you right now.

MR. RAMSEY: Okay. Thank you.

THE COURT: Thank you.

MS. KLEIN: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MS. KLEIN: I'm trying to -- I'm talking because I'm trying to get this to the right level where you can hear me, but I'm not too loud.

I'd like to turn first to the two questions the Court asked and let you know where we differ from the Defendant's argument.

You asked first why should it matter which department you're in? And, of course, Mr. Ramsey mentioned anthropology and obstetrics, that throughout the anthropology department and throughout the obstetrics department, assuming they were within one big university, you would have higher salaries -- everybody in obstetrics, and the salary scale over here would be lower in anthropology. I usually use business and English or, you know, some sort of humanities.

But that's absolutely true, okay? You can't just say there's an associate professor over there making twice what I make, you know, sorry, that's the pay grade. So

that's why when we cited another department, as we had to because of the small group, we said it's not just that she's making more because that department makes more because the tenure-track people in the comparators' department are all making less than the tenure-track people in Professor Irizarry's over in engineering. So that's why we brought those people in.

But I'm just going to back up and say basically, we agree with Mr. Ramsey, the department can make a difference.

Now, what's different here is that anthropology and obstetrics, even couched in the same university, would never be in the same school. You would have a School of Medicine, you would have a School of Social Sciences. Here, it's one school that has business, engineering, computer science in it, and the business people we're not looking at. But if you look at computer science and engineering, it's the same dean making the recommendations for salary.

And all of the cases -- just specifically looking at the Fifth Circuit one that gets cited, I think Lee, one of the factors is who is making the salary determinations? So even though different academic departments may not be similarly situated, if you have the same person determining the salaries in these different departments, you can be

similarly situated enough.

And when we get this whole similarly situated enough, we are really getting beyond the pleading stage, Your Honor, and I'll come back to that.

The other question was what if it's just a really, really small group and you don't have a comparator? Well, that's what the Cicalese -- is how I've always pronounced it, it could be Cicalese, I don't know -- but the UT Med Branch Fifth Circuit case out of 2019, in that case, they said, well, they were Italian Americans or something, the Plaintiffs, and the Court said there may not be somebody exactly like and you have to, you know, go with what you have to try to get to the McDonnell Douglas standards, and we're not going to throw out a complaint on that basis.

Doing Plaintiff's work not exclusively against A&M Texarkana, but we have other administrators, for example, who may be the only administrator with that title. You know, there may be only one associate provost for X. And for a Defendant to be able to say, well, there's nobody else with those same exact title or job duties, it doesn't get the Defendant off the hook. You can't discriminate against somebody just because they're unique or just because there's a small pool.

So you find a comparator that may not be the exact same thing. We don't have a whole bunch of people at one

pay grade level with one title here. We have one engineering faculty member who is at the instructor/lecturer level, and that's Plaintiff, Professor Irizarry. There's one other who's some sort of lecturer but also is the director of the forestry program.

And then you look at computer science. There's only one lecturer/instructor, and that's the one we proposed as a comparator. Okay?

And in the reply brief, Defendant said, no, there's, like, seven. They're all in business. They're all in the business school. Every other lecturer/instructor besides the ones we mentioned are in the business school. So we -- we're talking about small departments, small levels of faculty, and that is just to answer the two questions you asked.

Now I'd like to kind of go back to where we are, and I apologize -- I apologize. I needed a sip of water.

We asked this Court to permit us to file an amended pleading to just narrow the focus of this case to the one undisputable adverse employment action that A&M took against Professor Irizarry of arbitrarily lowering his salary by 25 percent with -- with no explanation, no apology, and, in fact, going so far as to claw back what it had paid the previous month.

THE COURT: So I understand that, but as I

understand it, we're past that point because you're comparing -- are you saying that the present claim relates to the $25,000 salary reduction and the fact that they clawed it back?

MS. KLEIN: Yes.

THE COURT: How is Professor Ren in a comparable situation to that?

MS. KLEIN: Okay.

THE COURT: There's nothing in the pleadings to suggest that she was somehow removed from the tenure track for failing to apply by the deadline.

MS. KLEIN: Right. Well, there is nothing and there never has been anything that he was somehow supposed to be or had to be punished for failing to -- failing to take the next step to stay on the tenure track, okay? That doesn't mean he deserves less pay than somebody else who is not on the tenure track.

THE COURT: No. But you're not answering my question. How is Professor Ren comparable to Mr. -- or Dr. Irizarry if there's nothing in the pleadings to suggest that she was in any way removed from the tenure track?

MS. KLEIN: Because that's irrelevant, Your Honor. That is our position, and I'll explain to you why if you'd like, okay?

Professor Irizarry was on the tenure track. As

Mr. Ramsey said, yes, it's preferable to be on the tenure track than not because you have something to look forward to where you cannot be dismissed at the end of a term contract without cause. You are -- you now have tenure. You're in a good position. You also teach less classes, and that's important to note.

But what Mr. Ramsey said about he was taking up space for somebody else who could have been tenure track, that that's -- there's a limit to that, that is entirely out of the record. I don't know where that came from, but there's no argument -- or no facts or anything in the record that I'm aware of that says he was taken off the tenure track and that meant that they'd wasted time having him on the tenure track or something. That's not in this.

What's in this -- what's in the record is during that year, he was supposed to -- if he was going to stay on the tenure track, come up with portfolio of where he was for his pre-tenure review. He didn't do that. So he was told in the fall -- I don't want to get the years wrong because it gets a little confusing because we've been at this a while.

But in the fall of 2023, he is told that he will no longer be on the tenure track. He is at that point tenure track, assistant professor, teaching four classes, making 95. They say you're off the tenure track. We're

going to do a new contract for you for next semester.

So for the spring of 2024, he has a new contract that he gets, I think, in Novemberish of '23 that says lecturer, one semester, the annualized salary is 95. Now he's teaching five classes, okay? He's getting the same money, but he's not tenure track, which would have been preferable to be. He's teaching more classes, making the same money. And he's told we could have lowered your salary, but we didn't.

Then in May, he gets a contract that says you're going to make 95 for the next academic year. Then he gets -- oh, he gets that after he has some message from his dean saying we're lowering you to 70. But then he gets a contract that says 95, and he starts working, and he gets his first paycheck at 95, and then all of a sudden it gets lowered to 70, including the clawback. And you're asking me, well, we're way past that. Actually that's exactly what --

THE COURT: I recall all of that. I'm trying to understand why it doesn't matter for purposes of comparing to the -- to the single comparator you all have given --

MS. KLEIN: Sure.

THE COURT: -- that she did not have any situation like that, and you keep promising me you're going to tell me why it doesn't matter.

MS. KLEIN: I think --

THE COURT: And I'm all ears.

MS. KLEIN: Because it doesn't matter because he's already been off the tenure track. He's had a contract as a lecturer for 95,000 for this semester when he wasn't on a tenure track. He has a contract for 95 for the year when he's not on the tenure track, and they take it away. And what we're told is that, oh, we had to do that. He wasn't on the tenure track anymore. No, he's teaching five courses, whereas tenured people teach three, but we're going to pay him 25 percent less without any reason. We say there's no reason for it to have been lowered.

THE COURT: So you're saying it doesn't make any difference now whether he was or was not on the tenure track for purposes of your claim?

MS. KLEIN: Correct. And we were told two things. One, that you have to be making less. You're not going to be -- you know, you're not going up for tenure anymore, so, of course, it comes with a cut in pay.

And what we've tried to show, partly because Your Honor mentioned comparators in the previous order dismissing the other claims, we tried to show, well, there is no reason for an instructor to have to make this low a salary just because they're not tenure track. And as evidence of that, we show someone else in the same school,

who, by the way, you know, not only do they have the same title, they're in the same college, right, which is the same appointing authority of the dean, the same people are making the decisions about the pay. I believe we alleged she only has a master's and less experience as opposed to a Ph.D. in engineering. And even what Mr. Ramsey said about, oh, she makes 72 compared to his 70, and now she makes 74, she still makes more than he does.

THE COURT: By $2,000?

MS. KLEIN: Well, when you're only making 70, Your Honor, I would -- I would posit that 2,000 means more than if you're making a lot more.

THE COURT: Well, I mean, it's $2,000 more.

MS. KLEIN: It is more. And I will tell you two things, and he wants to talk about, oh, well, this is why you do an investigation with the EEOC. Well, here's why you don't pour him out at the pleading level, because all we have access to is publicly available information, and it says this is what she made. Maybe it includes summer salary and maybe Mr. Ramsey's numbers don't include summer salary. We don't know. We just know that in a -- in a department with the same dean where the professors are making less than the professors are making in the engineering department that has the same dean, the lecturer is making more than he is. Okay? Now -- so why is that if

it's not because of discrimination?

THE COURT: So where is the -- where is the -- does Professor Ren make the same amount as a professor on a -- on a tenure track?

MS. KLEIN: I don't know if she does or not. I don't think we said that, no.

THE COURT: Okay.

MS. KLEIN: But whether he needs to make the same amount as those on the tenure track or not, why did he have to be lowered to 70? Why did nobody tell him this? Why is it so low that it's even lower than somebody with a master's in a comparable department?

THE COURT: Is that -- is that something that's alleged in the complaint?

MS. KLEIN: Which part? I think everything I just said is, yes, that it was discriminatory to lower this -- to take this salary away that he had. They had no reason to do that other than discriminatory reasons.

THE COURT: So other than the comparison to Professor Ren -- other than the comparison to Professor Ren, can you cite to any instance, example, occurrence, or event to support his -- your argument that his salary was reduced because of his race or his national origin or his religion?

MS. KLEIN: Well, we have the allegations that

he's treated differently because of his religion, that the Muslim engineering professors are permitted the more favorable time slots for teaching because their wives don't drive and they have to leave to go get their kids. That's in our second amended complaint at Paragraph 4. -- 4.5.

THE COURT: So you're saying he gets less desirable class hours?

MS. KLEIN: Yes. The scheduling of the classes are at the -- at less desirable hours. That is another piece of evidence that the attitude in the department is to treat him differently and less favorably because he's not Muslim.

We also had an earlier event that -- and, of course, that's not -- we're not suing for that as the adverse employment action. We're just alleging it -- as you said, that is in the record as evidence which can certainly be circumstantial. We've cited case law to that effect.

THE COURT: Oh, I'm -- I'm fully aware of that.

MS. KLEIN: Okay. Sorry, Your Honor. I apologize.

THE COURT: My question is what are they? All you need to do is tell me what they are.

MS. KLEIN: That was one.

There was -- there's some more allegations of what

had gone on in the year before in 2022 in Paragraph 3.4 where despite the fact that Professor Irizarry is the only licensed engineer in the department, Muslim faculty or non-U.S. citizen faculty, the folks in the -- in engineering are different from all his protected classes. So at least --

THE COURT: What was done to him because of his race, his national origin, or his religion?

MS. KLEIN: He was denied the coordinator position for mechanical engineering, Paragraph 3.4.

THE COURT: Okay.

MS. KLEIN: And denied --

THE COURT: Wait a second. Ma'am, can you just focus on my question?

MS. KLEIN: What was done to him?

THE COURT: Yeah, because of his race, his national origin, or his religion.

MS. KLEIN: Okay. So we've got the classes. And now we've got the denial of appointment as coordinator of the mechanical engineering program. And we've got denial of extra equipment funding and lab tech support.

THE COURT: And your claim in your pleadings is that all of that was done because of his race, his national origin, or his religion?

MS. KLEIN: Correct.

THE COURT: Okay. And we're now at a point where the only hard evidence you have of that --

MS. KLEIN: Uh-huh.

THE COURT: -- in your complaint is that he made $2,000 less than a lecturer in another department; is that right?

MS. KLEIN: No, our hard evidence of -- of his being discriminated against?

THE COURT: Yeah. I'm trying to understand what the connection is between the things that you just listed and the -- and all of those facts that support that and how the person who made the decision to pay him $2,000 less are related.

MS. KLEIN: Your Honor, we're not complaining that he's making 2,000 less than she is. We are complaining that he's making 25 percent less than he had the semester before and that he is worth and earning and deserving, teaching five courses a semester when nobody else does. He is underpaid. That is our complaint, that they dropped his salary, and they had no reason to do so.

How do we know they had no reason to do so? How do we know that they could have still been paying him what he's worth? Because in this department over here, somebody is making more than he is, even though she's less qualified and even though in her department salaries are lower.

So we don't even say he should be making the 72 or 74. He should be making more than she is. But the point is even over there where the professors make less, there's a lecturer making more. They're telling us, no, we have to pay him less because he's not tenure track, he's just a lecturer.

Well, for one -- the first evidence is for one semester, they gave him a whole semester contract at the higher rate. Then they gave him a whole year's contract at the higher rate. Then they dropped it. That's an adverse employment action. In any -- I mean, he talks about getting off the tenure track as being a demotion. Well, it's clearly more demonstrably and measurably harmful more adverse to have your money taken away.

THE COURT: So I respect all of that and I --

MS. KLEIN: Okay.

THE COURT: May I get my question out?

MS. KLEIN: Uh-huh.

THE COURT: I respect all of that. What I've asked you to do is to describe for me exactly what action was taken against him, and you've given me some examples of that.

What I'm trying to understand is how any of those facts that you argue occurred are connected to any of the people who made decisions about his salary.

MS. KLEIN: Okay. So Dean Sharma and Chair Morsy -- Morsy is the chair of his department, and he's alleged to be part of these decisions. That's Morsy at the department level making decisions about when -- when the Muslim guys teach versus when Dr. Irizarry teaches, about who is going to be coordinator. He's making that decision along with the dean.

THE COURT: Okay. So the --

MS. KLEIN: And the dean is making -- it's alleged in our complaint that the dean makes the salary decisions, recommends them to the provost. So the dean over this college is making decisions for the salary of Professor Ren and the other people in her department and for Professor Irizarry and the other people in his department. Same guys, same non-U.S. citizen, Muslim decision-makers.

Am I closer to answering your question?

THE COURT: Yes.

MS. KLEIN: Okay. I think that I want to end where Mr. Ramsey began, as far as whether this claim is properly before you at all, right, the EEOC exhaustion issue. And there are a lot of things that he said that I would take issue with, and I'm going to try to limit myself to about four things.

First, attached to the motion to dismiss at Document 38-1, Page 2 of 3, which is Page ID No. 297, it

sets forth the exact complaint that we have in our pleading, and it ends with the university's abrupt reduction in my contracted annual salary by 25,000 were all based on my ethnicity, race, color, national origin. So the decrease in salary and what led up to it is all over that page. It was definitely set forth in the charge.

THE COURT: What's the date of that?

MS. KLEIN: What's the name of what?

THE COURT: The date, what was the date of that charge?

MS. KLEIN: October 1st, 2024.

And the right-to-sue letter came the same month, which also states -- it's also -- it's Document 38. -- 38-2. So the same month -- and I'm not sure why there are two exactly, but I probably could figure it out if I really tried. But at latest that document, which is Page 1 of 10 of 38-2, Page ID No. 299: The EEOC has granted your request that the agency issue a notice of right to sue where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

There is nothing nefarious or cheating on our part to have said we'd like our right to sue and for the EEOC to issue a right to sue. It's not -- so that there's no time for the school to figure out what we're complaining about.

It's been -- it's been 18 months, or it will be 18 months in April since this. If they had a question about, you know, we never really did get a chance to push back and explain to you why we lowered his salary, nobody's done that. Nobody's told us, hey, here's why we pay this professor less and not you. All we've gotten is you did everything wrong, you don't have a lawsuit, et cetera, et cetera. We mediated this case. They didn't come forward with it then.

The idea that because we were issued a right to sue and filed the lawsuit, that A&M was deprived of its chance to figure out or explain to us what its defenses were is just nonsense, Your Honor.

The next step is he does talk -- he's close to right as far as there is the idea that if something could have been investigated by the EEOC based on what we alleged, even if it's not on the face of it, that some courts have said, well, that's okay if the EEOC had a chance to investigate it.

He's right as far as that goes. But in our case, it's right on the face of it. Our complaint is that his salary was lowered. Why was his salary lowered? Based on his experience there, he thinks it was discriminatory. Okay. That's what we alleged. Then we filed suit.

And our argument against the idea that it had to

be lowered because he was taken off tenure track is to push back and say, that's not strictly the case because, one, you kept paying him 95 for the first semester he was non-tenure track, then you promised to do it for another year, and then you took it away. You didn't have to lower him 25 percent to 70,000, because you're paying someone else more than that, and she's less qualified.

THE COURT: And she's not on the tenure track?

MS. KLEIN: True. And he's not either. And he hadn't been for almost a year when they took away the salary.

THE COURT: Right.

MS. KLEIN: So that's -- that's where I am, Your Honor.

If you have any other questions about the timing of this EEOC --

THE COURT: So help me understand exactly how the EEOC would have investigated the differences between the salary that Dr. Irizarry was -- was earning and the salaries of the non-tenured lecturers based on that you just read to me.

MS. KLEIN: Based on what I just read to you, that they wouldn't have finished in 180 days?

THE COURT: No. What they -- the claim that you made in filing --

MS. KLEIN: Oh, sure.

THE COURT: -- filing the charge of discrimination. How would they have investigated that?

MS. KLEIN: To figure out whether the abrupt reduction in contracted salary was based on his ethnicity, race, color, et cetera? First, they would have asked TAMUT for a position statement. That's the first thing that happens. And they're usually single-spaced, 12 pages with about 10 exhibits. And then we all see what TAMUT's position is, and then they come back to us --

THE COURT: I know how that process works.

MS. KLEIN: Okay. I'm sorry, Your Honor.

THE COURT: So you -- there was a charge of discrimination that was filed that was part of what you just read to me, something that was filed on October the 1st of 2024.

MS. KLEIN: Right.

THE COURT: So how, based upon the charge of discrimination and the events that are described in that charge, would the EEOC have investigated this difference between what Mr. Irizarry was earning and the other salaries of non-tenured lecturers?

MS. KLEIN: Are you asking me how they would have done that without her name in the charge --

THE COURT: I am asking --

MS. KLEIN: -- because they would have --

THE COURT: I'm asking how they would have done that based upon the allegations in the charge.

MS. KLEIN: They would have tried to find out from A&M what its reasons were for this decrease in salary if they weren't discriminatory, and they would have said, I guess, among other things, well, that's what we pay people who aren't tenure track. And then we would have said that's not true because there are non-tenure-track people in that school who aren't making that big a difference between the non-tenure -- I mean, the tenure track.

THE COURT: And so you think what's alleged there is enough to lead them down that road, the EEOC?

MS. KLEIN: Yes, Your Honor. On the -- and this is just off the -- you know, not part of the record, just as Mr. Ramsey has his ideas about what goes on with the EEOC, but in the new e-filing -- attorney e-filing, it specifically tells you a charge should not include a comparator. I don't know. We try to if we have one handy.

But, yes, the EEOC investigates discrimination claims without comparators based on what's on their own filing website of what you should be putting in your charge. So I don't -- it gets confusing as to what needs to be in it, but certainly there's nothing hamstringing them from -- sorry -- depending on what the school says,

you know, looking for a comparator or asking us what our evidence is. I mean, you start with a charge, but you add other evidence once you see what the position paper says.

THE COURT: But you all made a decision not to let that play itself out for one reason or another. I'm not criticizing you. I'm just saying you all asked for your right to sue, which it was -- you were entirely within your legal right to do that.

MS. KLEIN: Again, that is also a checkmark -- a box now on the thing is do you want a right-to-sue letter issued immediately? And you can say yes or no. But it will always say we're finding we couldn't investigate this in that many days.

THE COURT: That's all I have. Thank you so much, Ms. Klein.

MS. KLEIN: You're welcome.

MR. RAMSEY: Your Honor, may I?

A few points in response, Your Honor. I just want to clarify, although I think we're on the same page, that a lot of what was discussed when Ms. Klein was up here has already been decided by this Court.

They are not suing on anything that happened prior to, I believe, October 2024, except for the reduction in salary, which this Court has previously found was not based on retaliation or discrimination.

But then there's this argument now that we didn't have to reduce his salary when he got off tenure, and yet there is also an acknowledgement by all parties, and really everybody who knows anything about the university system, that a tenure professor job is a high -- is a better job. So -- and it requires more.

In fact, one thing we know from the record is that there is apparently a portfolio that you have to do, presumably to present your publications, that Mr. Irizarry did not do. So he is essentially suggesting that even though he didn't do what it took to get a tenure position and maintain a tenure position, he should still be getting the same pay.

THE COURT: I think what's problematic is that he did receive the same pay for a while, and I gather that was a mistake on -- on the Defendant's part. Is that what happened?

MR. RAMSEY: There's -- there's two parts. One part is not a mistake. It is that he was already there for an academic year. In other words, it was -- according to the complaint, he was told in I believe October of 2023 that he would not be on tenure track the coming year. So a large part of that delay is because he already had a letter of appointment, and he was already within the school year, and that -- that contract finished out.

Then when the new year started, there was a -- I think a one-month mistake in which he was still in his old salary, and they identified that and corrected it.

In that regard, Your Honor, as far as disparate treatment or disparate pay, that still does not indicate it was discriminatory. There is a clear reason why that happened, and he would need to show that other professors stayed on their salary longer after not meeting the requirements for tenure track.

THE COURT: But during the mistake period, was that just one month?

MR. RAMSEY: It could have been two.

THE COURT: Okay.

MR. RAMSEY: I don't think it was more than two.

THE COURT: A short period, okay.

MR. RAMSEY: I want to talk about this idea of comparators, because, you know, Ms. Klein said, well, sure, there's seven instructors or lecturers in the College of Business, Engineering, and Technology, but we discounted all the business professors.

The obvious question there is why? If the argument is that the college is what matters, which, again, is not generally what Irizarry argues, but when it comes to salary, he's saying, well, the college matters. Why have you excluded six potential comparators? Is it because

their salaries are also low? I don't know.

But the point is you can't have it both ways. You can't say there aren't enough comparators so we had to choose Professor Ren, but also these other six that were in the same college as Professor Ren don't count because they're in the business school. It's not -- it's not internally consistent.

With regard to the EEOC issue, you know, Ms. Klein asked how could we know about these things unless we do discovery? Again, internally inconsistent because we also learned that there would have been a position statement, and there would have been a back and forth where -- in which TAMUT would have said, we lowered his salary because he's a tenured professor -- I mean, he's no longer a tenured professor. And they would have said, well, what about Professor Ren? And we would have said, well, she makes $72,000, what's the big deal, and/or here's the other professors that are lecturers. None of that happened.

And she's saying how can we do that without discovery? Well, that is how you do it with discovery.

The other thing is once the lawsuit starts, I mean, we have sent this information now regarding the salary. We've previously seen information where Irizarry sent an email specifically asking not to be considered for tenure.

But the cat's out of the bag. We're in the lawsuit. That's my whole point is there's some really clear exit ramps here that were just blown past by filing an EEOC charge and immediately asking for a right to sue.

Now, there's also this -- again, another sort of tension in the claim here, and it is that, you know, all of the professors are Muslim. First of all, what are we talking about, because in the school of -- in the whole school, the College of Business, Engineering, and Technology, that is clearly not true. It's not alleged to be true. It's clear from, you know, the exhibits. And even in the response, they start to back off that idea.

So in the College of Business, Engineering, and Technology, there is no allegation nor is there any truth to the idea that the majority of those, that most of those, or all of those employees are Muslim.

So he's only at that point talking about his colleagues in the mechanical engineering -- or the engineering department, which even then is not true that they're all from the Middle East.

You know, and there's a -- there's a couple times in the complaints where the claim of discrimination veers into prejudice. There is some -- in the first amended complaint, they talk about how the Muslims were all against him because he fought in the Middle East. I don't --

there's -- that seems to be saying, oh, they don't like me because I'm Muslim because they don't like American soldiers. There's no reason or rhyme or basis for that.

And now the idea that they get preferable schedules because their wives don't drive. Again, they're not even all Muslim.

And aside from that, the schedule -- let's take it out to the College of Business, Engineering, and Technology, if that's where we're looking for comparators. Are they saying that those 30 professors, some of whom are women, get better schedules because their wives don't drive? Again, it's internally inconsistent where they draw these lines.

And the final point on that is we're using Professor Ren as a comparator, but there's no allegation that she's Muslim. So this idea that the dean is Muslim and the provost is Muslim and so they're lowering Irizarry's pay because he's non-Muslim, well, what about Professor Ren? Assuming for the moment she made $90,000, it can't be proof of discrimination that you are being discriminated against because you're non-Muslim when the person you point to is also non-Muslim.

And unless you have further questions, that's my full rebuttal.

THE COURT: I think that's all I have. Thank you,

Mr. Ramsey.

MS. KLEIN: Your Honor, I don't want to take up a lot of your time, but may I please respond to a couple of things that were --

THE COURT: Yes.

MS. KLEIN: -- misstatements?

Your Honor, we allege in our complaint at Paragraph 3.11 what actually happened, which is he was not permitted to just finish out his last contract as a tenure-track assistant professor. Paragraph 3.11 alleges on November 17th, 2023 -- so after he's been told you're going to be off the tenure track, he received a letter of appointment signed by the provost declaring he was being appointed as a non-tenure-track instructor for the upcoming spring semester beginning January 2024. As promised by Provost Arnold in the October 9th, 2023 meeting, his nine-month salary remained at 95,172, prorated, okay?

And what the provost had said is in the paragraph prior, 3.10, I could have changed your salary, but I am not going to, okay?

So the idea that, oh, they just let him finish and then the next year he was less, they have kept him on. He is clearly needed there and being paid there, and he's just not being paid what he's worth.

Now, whatever kind of discrimination may be going

on, I don't know. But the idea that you have to do a lot of work to get tenure and, therefore, it's entitled to more pay, I just want to back up and clarify this. Of course, tenure-track professors are hired to hopefully work toward tenure.

At this particular university, there's a mid-review that requires its own portfolio. And then, of course, you'd still have to do a tenure packet to apply for tenure. And then once you have tenure, in part, that's its own reward. Another reward of being tenure track is you teach less classes because you're meant to be doing research, et cetera, and publishing.

So it's not directly comparable. For instance, if you're tenure track and you're only having to teach three classes versus you're an instructor and you're full-time teaching five classes, why do you need to make 25 percent less? There's nothing in the record about him having to be decreased.

But that's -- the most important thing was that he was kept on at 95 under a new non-tenure-track contract, then he got another contract May 13th, signed by the provost for nine months, '24 to '25. Again, higher.

Nobody ever told him it was a mistake. They just took it away. And I'd like --

THE COURT: There was not a letter -- I thought

there was a letter to him explaining an error had occurred. Is that not right?

MS. KLEIN: No, there was a letter to everyone saying, some of you may get new contracts with a different starting date of August 16th. This wasn't a starting date error. This was now you're making less, and we're taking back some of what we paid you.

I don't know if -- if it's -- if it matters, Your Honor, but what -- the standard of review isn't whether the response attached something that became internally inconsistent. Based on our complaint, we have alleged enough that there was discrimination based on the makeup and the decision-makers in his department, his experience in that department to say, oh, there are business school teachers who are women, their wives aren't Muslims and stay at home. The basic unit is department.

He's right, that's -- all of the engineers are non-U.S. born. I don't know what he means by, oh, they're not all Muslim. Kim, she's not Muslim. She's new. She's the lecturer that has the forestry issue, but she's also Korean, non-U.S. And Professor Irizarry. As far as I can tell, everybody else in engineering, it's our understanding, is both Muslim and from the Middle East.

And that's where decisions are being made to his detriment, other than this salary one, which, again, the

dean is Muslim. And of course Professor Ren isn't Muslim. We haven't alleged that, but she's -- she's not Puerto Rican, Hispanic, U.S. born, a Catholic. Maybe that one is not religion, but it's still a comparator of --

THE COURT: Well, that's what -- that's the allegation. The allegation is that it is religion.

MS. KLEIN: For her?

THE COURT: That's the basis of his complaint, Ms. Klein. That's what you've been talking about for an hour and five minutes now.

MS. KLEIN: Have I? Okay. I'm sorry, Your Honor.

I believe we've alleged national origin, that he is the only non -- he is the only native U.S. citizen.

THE COURT: Well, that's --

MS. KLEIN: And she's not. She's from China.

THE COURT: Okay. Well --

MS. KLEIN: He's the only Hispanic. She's not based on her picture. I mean -- so anyway, it's true that once the motion to dismiss pointed to the page of the college, we did make additional observations regarding the makeup of -- of those departments, but we don't have information about the business school or its salaries. We have information about Professor Ren, and that's why she was alleged.

We're not trying to hide information about the

five lecturers in the business school. I don't know anything about them.

And I don't have anything further to say, except that what's in our pleading is sufficient to meet the standard for review here.

THE COURT: You know, it normally would, and that's why I'm struggling with this because it's -- you know, I'm not sure that I've seen one in a long time that actually came close to, you know, probably needing to be dismissed on the basis of just inadequate pleadings.

And, you know, the vast majority of the time, these cases get to summary judgment. But this is -- this is a little closer.

MS. KLEIN: Okay, Your Honor. Well, I think just based on the cases that have been cited, they all do seem to be summary judgment that get dismissed because no one's made a close enough comparator, and we don't see those dismissed at the pleading stage.

But then again, here, we alleged a comparator despite, you know, the Cicalese case saying you don't necessarily have to to survive a 12(b)(6), but -- because the Court had determined before that we needed one, we came up with this woman who had -- you know, they had worked together, he knew her, and he knew what she was making or believed he knew what she was making, and it seemed like it

was adequate for the argument we were making, that there was no need to lower his salary that way.

THE COURT: Understood. Thank you.

Anything else, Mr. Ramsey?

MR. RAMSEY: No, Your Honor.

THE COURT: Okay. Could I ask the parties to jointly request that the transcript be prepared of the hearing this afternoon and get that docketed.

And I appreciate everybody being here today. Safe travels to you all.

COURT SECURITY OFFICER: All rise.

(Hearing concluded at 3:08 p.m.)

CERTIFICATION


I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.


_/S/ Shelly Holmes_____          3/12/2026___
SHELLY HOLMES, CSR, TCRR                Date
CERTIFIED SHORTHAND REPORTER
State of Texas No.: 7804
Expiration Date: 10/31/2027